ERIC V. KLEINER, ESQ.
385 SYLVAN AVENUE
SUITE #29, SECOND FLOOR
ENGLEWOOD CLIFFS, NJ 07632
*Attorney for Plaintiff,*
*ESTATE OF BERNARD PLACIDE*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Myrlene Laurince, individually and in her capacity as Administrator ad Prosequendum for the ESTATE OF BERNARD PLACIDE, Deceased, | Case No.   2:23-cv-03063-JXN-MAH |
| Plaintiff, | |
| v. | |
| CITY OF ENGLEWOOD, ENGLEWOOD POLICE DEPARTMENT, OFFICER LUANNA SHARPE, OFFICER BRIAN HAVLICEK, OFFICER LANGIE FERNANDEZ, and JOHN/JANE DOE/S NOS. 1-15, (fictitious identifiers), XYZ CORPORATIONS NOS. 1-15 (fictitious identifiers), individually and/or in their official capacities, jointly, severally, and/or in the alternative, | **FIRST AMENDED COMPLAINT**<br><br>*Jury Trial Demanded Under Fed. R. Civ. P. 38(b)* |
| Defendants. | |

Plaintiff, Myrlene Laurince, individually and in her capacity as

Administrator ad Prosequendum for the ESTATE OF BERNARD PLACIDE, by

and through her attorney, Eric v. Kleiner, Esq., complaining against Defendants,

City of Englewood, Englewood Police Department [EPD], and EPD Officers

Luanna Sharpe, Brian Havlicek, and Langie Fernandez, alleges as follows:

## INTRODUCTION

1. On September 3, 2022, Bernard Placide, a 22-year-old African American, was first needlessly and excessively tasered and then callously and recklessly gunned down in his bedroom of his family home by Englewood police officers acting under color of state law in New Jersey. An ex-marine named Englewood police officer Luanna Sharpe, acting in a homicidal and cavalier cowboy fashion, with her laser sighted gun pressed against Bernard's bare chest, discharged her automatic weapon and the projectile penetrated and traveled through multiple of Bernard's organs.

2. Officer Sharpe was not in danger of serious injury or death when she shot and killed Bernard. Sharpe and her fellow officers were trained to deescalate in the situation presented in the Placide matter. Sharpe's use of deadly force

was excessive and was done with deliberate willful and reckless indifference to the sanctity of human life.

3.  Prior to the tasering, shooting, and death of Bernard, Defendant EPD police officers and their law enforcement superiors failed to intervene to stop the tasering and the shooting when they had an affirmative duty to do so.

4.  Immediately after the shooting, Officer Sharpe, in a heinous and indefensible spontaneous act that proves Sharpe had immediate and unvarnished consciousness of guilt, failed to render any medical aid to Bernard, and instead callously and capriciously fled the scene ignoring her first responder duties as a police officer, leaving Bernard for dead; stopping and delaying Bernard from receiving treatment in a life and death moment.

5.  The remaining Englewood police officers at the scene, distracted by Sharpe's attempt to flee the scene of the shooting, lost crucial seconds causing a delay in calling for emergency medical services [EMS] and for the ambulance [ALS]. Englewood police abandoned protocol and training after being unable to immediately stabilize Bernard, they refused to move him to a staging location where EMS and/or ALS could treat him and get him on his way to the Englewood Hospital STAT. Englewood police were not using sufficient lifesaving procedures given Bernard's agonal breathing. The

officers also did not indicate that all was clear stopping ALS and EMS in getting to Bernard's side.

6. At least several precious minutes were lost, costing Bernard any chance of surviving, as the police coldly, callously, and with willful or reckless disregard for human life abandoned Bernard to look for a knife in the room Bernard was shot in, and to stop Sharpe to secure her handgun.

7. Bernard lost significant time due to police actions, robbing him of any chance for survival. The hospital was only six [6] minutes away from the scene of the shooting by ambulance and Bernard did not get into the Emergency Department of Englewood Hospital until more than 30 minutes after he was shot.

8. As a result of Bernard Placide's September 3, 2022 death, occurring at 258 West Englewood Avenue, NJ 07631, the Estate of Bernard Placide (which includes his biological mother Myrlene Laurince and his siblings) prays for relief in the United States District Court alleging violations of U.S.C. 42 § 1983, the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, and violations of New Jersey common law tort laws.

9. The criminal investigation of Bernard Placide's death is presently under the jurisdiction and control of the Office of the Attorney General, State of New Jersey [NJOAG], and is pending Grand Jury presentation. The underlying

internal administrative internal affairs [IA] matter, which is discussed herein, is under the jurisdiction and control of Defendant Englewood Police Department. As such, at the time of the filing of this Complaint, Plaintiff has no access to the core central identification evidence such as the IA files and interviews, autopsy evidence, ballistics evidence, NJOAG reports, police reports and many audio and video body cam and internal police communication records. Plaintiff does have certain hospital records from Englewood Hospital and a few redacted audio and video pieces of footage that are contained on the NJOAG website, as well as our own canvass witness statements in our pre-litigation investigative files. Therefore, it is anticipated that this Complaint may need to be amended when full discovery becomes available, and that additional parties may need to be added to the action, particularly as it regards Defendants' lapses in supervisory control and organization and in not defining a clear chain of command. One can only imagine the horror that will be seen when the bodycams covering the aftermath of the shooting are released depicting the sheer depravity of the failures made by Englewood Police Department officers in leaving Bernard on the floor of his bloody bedroom, handcuffed behind his back while he went into agonal breathing, fighting for his life alone—a scenario where death was a certainty and lifesaving attempts were paltry.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over federal questions pursuant to U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 1983 and 1988.

11. The state court causes of action pled in this Complaint are within the federal District Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for pendent state claims.

12. Venue in the United States District Court of New Jersey, Newark vicinage is proper under U.S.C. §1391(b) because all incidents that are the subject matter of this Complaint occurred within the Newark federal Judicial District, and the parties reside in this Judicial District.

## THE PARTIES

13. The Estate of Bernard Placide (hereinafter, "Plaintiff" or "Estate") is the Plaintiff in this action.

14. At all times relevant hereto and until the time of his death on September 3, 2022, Plaintiff's decedent, Bernard Placide, was a citizen of the United States and the City of Englewood, County of Bergen, state of New Jersey.

15. Plaintiff Myrlene Laurince is the biological mother of Bernard Placide, deceased. Bergen County Surrogate Court of New Jersey is processing Myrlene Laurince's submissions and is preparing her Ad Prosequendum

status but is delayed due to post-COVID staffing shortages at the Surrogates Office in Bergen County, New Jersey. Ms. Laurince brings claims herein both individually and in her capacity as Administrator ad Prosequendum on behalf of the Estate of Bernard Placide.

16. Defendant City of Englewood, hereinafter referred to as "Defendant Englewood," is a municipality or local governmental entity that exists and operates in Bergen County, New Jersey, with a principal physical address located at 2-10 North Van Brunt Street, Englewood, NJ 07631.

17. Defendant Englewood Police Department, hereinafter referred to as "Defendant EPD," is the police force that provides law enforcement services in Bergen County in the City limits of Englewood, New Jersey, and employs Defendant Police Officers Luanna Sharpe, Brian Havlicek, and Langie Fernandez, as well as several John/Jane Doe/s Englewood police officers believed to be involved in the incident/s that are directly and materially related to this lawsuit.

18. Plaintiff is unaware of the true names and capacities of those defendants sued as John/Jane Doe/s 1 through 15 (fictitious identifiers). Plaintiff will amend this Complaint to allege the John Doe defendants' true names and capacities when that information becomes known.

19. It is anticipated that once the confidential IA files and NJOAG criminal files are released in the civil discovery process, Plaintiff may move to amend the Complaint to add additional defendants who were also involved in this matter in their function as Englewood police officers. However, given the lack of discovery there is a lack of information at the time of the filing this Complaint. Such amendments when and if made will be governed by the relation back rule under law.

20. The named individual Defendants, Lange, Havlicek, and Sharpe are being sued in both their individual and official representative capacities as Englewood police officers acting under color of law.

## **FACTUAL ALLEGATIONS**

21. The decedent Bernard Placide was twenty-two (22) years of age when he awoke for his last day of life on this earth on September 3, 2022. Plaintiff's decedent was an African American male who had been a star football player at Dwight Morrow High School, where he was recruited to also play college football.

22. Bernard and his mother lived together in a three-story home with several other family members and relatives at 258 West Englewood Avenue, NJ 07631.

23. Due to football program slowdowns, dried up funding, and delays caused in part by COVID-19, Bernard was unable to achieve a college football scholarship. Also, Bernard had suffered a series of head injuries on the football field dating back to 2017, severe enough to cause a hospital visit in and the ordering of a CT scan analysis. Bernard had frequent headaches up to the time of his death, and other maladies circumstantially connected to his football head injuries.

24. According to Plaintiff's pre-suit investigations and interviews of civilian direct witnesses to the incident, prior to 8:30 am on September 3, 2022, Bernard was non-communicative and nonverbal and appeared not mentally well when he had a confrontation with his mother and his stepfather, Obed Hilaire. In the course of a confrontation with the three fighting in a small bathroom on the second floor of the residence, two kitchen knives are believed to have had their blades broken off. Ms. Laurince and Mr. Hilaire had minor superficial injuries.

25. Bernard, in obvious mental and emotional distress, retreated to his bedroom on the second floor at the far end of the hallway from the bathroom.

26. Mr. Hilaire locked himself in his bathroom and was safe.

27. Myrlene retreated from the second floor to a safe place and she called 911 for assistance.

28. The 911 operator relayed the address of the incident to the Defendants over radio and informed them of a domestic fight involving family members where there was a knife held or involved.

29. At approximately 8:30 a.m., defendants descended upon the residence of the plaintiffs and went towards the back of the home. There were two entry ways into the house and two stairwells in the home, in the front and in the back.

30. Defendants Fernandez, Sharpe and Havlicek all arrived in separate vehicles at about the same time.

31. Defendant Havlicek was armed with a taser gun on his left side. All three officers had automatic weapons with laser sights on their person, along with their standard equipment.

32. Defendants Havlicek, Fernandez and Sharpe all had their body cameras [bodycams] equipped and turned-on for video and audio.

33. Defendants were in uniform and their badges were displayed on their uniforms at the scene.

34. Based upon the evidence released by the NJOAG, which is limited and partially redacted, there was no effective chain of command present when the three officers descended upon the scene, and this lack of a chain of a

command pervaded throughout the entire incident, including while Bernard lay dying in agony from the gunshot wound.

35. When Defendants reached the backyard, they quickly learned that Bernard's mother was only superficially wounded, was being treated, and was safe.

36. Defendants were then told outside that Mr. Hilaire was in the bathroom on the second floor.

37. There was still no chain of command as the Defendants ordered each other around and took roles as superiors, peers, and as subordinates at different times.

38. All three Defendants unholstered their automatic weapons and brandished them as they walked up the back stairway to the bathroom on the second floor. Defendants then encountered two family members bystanders on the stairwell leading to the third floor.

39. Defendants Sharpe and Havlicek gave orders, apparently to Fernandez, to clear the stairwell area to the third floor, with Defendant Havlicek acting as the officer in charge of the situation at this point.

40. Defendant Havlicek went directly to Mr. Hilaire in the locked bathroom just a few feet away on the second floor to Havlicek's left. Mr. Hilaire then exited safely down the backstairs to the awaiting ambulance personnel on the street. Mr. Hillarie suffered only minor superficial injuries.

41. Critically, Mr. Hilaire told Defendants that Bernard was down the hall in the bedroom. The police had now secured the scene and they knew Bernard had retreated down the hall to a bedroom, possibly with a small knife.

42. Defendant Fernandez then moved from the stairwell, leaving behind the two bystanders, indicating she had secured the scene.

43. From Defendants' vantage point, based on the situated area of the hallway and verbal information they had received from Mr. Hilaire, Defendants were aware or should have discerned that Bernard was suffering from acute mental or emotional trauma and had closed the door in full retreat.

44. Defendants chose to proceed on their own rather than call for the Rapid Response Team [RRT], which could assemble in minutes and had extensive training for these specific situations, specialized negotiators, state of the art tactics, the proper safety equipment and gear, other non-lethal chemicals and non-lethal boom devices which would avoid a violent possibly lethal interaction with a retreated subject at a secure residential scene.

45. Defendants knew or had constructive knowledge that the protocols and standard operating procedures established for local law enforcement functioning in Bergen County, New Jersey, called for the Defendants to call RRT and to seek supervisory direction from the EPD as to the situation at hand. Defendants completely abandoned their responsibilities and duties

along with the training, the education, the custom, and the directives that were supposed to be followed without fail.

46. Defendants collectively and individually failed in this regard in that they did not call for the RRT to be dispatched to their location, and none of the three officers sought supervisory direction from the Tour Commander or next senior officer on duty, as to what action should be taken now that the scene was secure.

47. The fateful erroneous decisions were made in clear and reckless disregard for human life individually and jointly by Defendants Sharpe, Havlicek and Fernandez. Any other John/Jane Doe/s EPD police officers found during the discovery process to have participated in the act to fail to call the Raid Response Team [RRT] for Bergen County may be added as defendants named in an Amended Complaint.

48. Based on the three partially-redacted bodycam videos taken from Defendants Havlicek, Sharpe and Fernandez, and partially-redacted internal police communications, once Mr. Hilaire traveled safely out of the residence, the defendant officers did not call for assistance, help, or for supervision from any superior or anyone at the EPD, in clear violation of their trainings and their procedures that are considered standard operating procedure in the field of law enforcement.

49. Video shows that once the scene was secured, Defendant Havlicek took over the chain of command. Defendant Havlicek started walking down the second-floor hallway with his handgun brandished with the sight openly displaying a fuchsia or purplish or violet-colored laser sight.

50. Defendant Havlicek went first down the hallway towards the long corridor to the bedroom where they knew Bernard was inside, having fully retreated.

51. Defendant Havlicek, with the gun and visible laser sight pointed down the hall, made aggressive and threatening loud remarks to Bernard and ordered him to come out of the bedroom.

52. Defendant Sharpe shouted and pointed her gun towards the bedroom while standing behind Defendant Havlicek. Sharpe's tone was extremely agitated, threatening, aggressive, and loud, indicating she was out of control and behaving erratically.

53. Defendant Fernandez was the farthest away from the bedroom and said nothing but her gun was also drawn.

54. Defendants' highly-aggressive posture escalated the situation and practically invited a lethal confrontation.

55. Defendant Havlicek saw Bernard behind the bedroom door, which was partially open, although Bernard kept retreating back away from the police officers and trying to shut the door.

56. When Defendant Sharpe first learned from Defendant Havlicek that Bernard had a knife, her handling of her gun appeared to shake indicating she was not in control and was not following her training as a police officer to handle the matter professionally.

57. Defendant Fernandez kept backing away from the other two officers Havlicek and Sharpe, but said nothing.

58. Defendant Havlicek had initially acted as the officer in charge, but Defendant Fernandez then took over as the apparent officer in charge.

59. Defendant Fernandez ordered Defendant Havlicek to tase Bernard. It is unclear from the video images whether Fernandez at the time of tasing still had her gun drawn. Defendant Fernandez's bodycam suddenly depicts a fourth Englewood John Doe officer who was in the hallway several feet away from the bedroom door near Fernandez. It appears that from the bodycam that this 4th officer did not have his gun out.

60. With Defendant Fernandez now giving orders, there was a complete breakdown in the chain of command. Not knowing that Bernard had a miniscule, small knife, was almost nude, and was fully retreating, Defendant Fernandez escalated the matter.

61. Defendant Havlicek followed Defendant Fernandez's order to tase Bernard despite knowing that tasing a naked target could cause mortal injury or

extreme voltage to the target causing unconsciousness, cardia arrest, serious injury or death.

62. The bodycams show Defendant Havlicek using the taser gun in his left hand, and it appears to show him shooting plaintiff with the taser with maximum force and voltage, far beyond what should be implanted against a partially nude subject.

63. Defendant Havlicek had received taser training and the taser manuals that come with the equipment clearly warn police officers from shooting a naked subject or from shooting at a persons' naked exposed skin, because the voltage rises exponentially, in excess of the acceptable dosage.

64. Defendants discriminated against the occupants of a Black Haitian home and targeted Bernard, a young Black man.

65. If the same set of facts existed but with a Caucasian family involved, de-escalation tactics would have been used.

66. At this point, Defendants kicked in the partially-open bedroom door and tased Barnard.

67. Defendants tased Bernard repeatedly and he went into a catatonic or unconscious or semiconscious state. Bernard immediately fell over onto the floor on his back, defenseless, with his head pinned against the wall.

68. Defendant Havlicek discerned that Bernard was unresponsive and unable to cognitively appreciate or understand any verbal commands.

69. Defendant Havlicek suddenly took back over the chain of command from Defendant Fernandez and ordered Defendant Sharpe to go into the room to take down the tased and electrocuted Bernard, who was lying on the floor on his back with his head pinned against the wall. Defendant Havlicek had at this point pointed his gun and sight at Bernard's body. Defendant Fernandez had retreated and a fourth John Doe Officer was seen in Fernandez's bodycam.

70. Defendant Sharpe can be heard on video panting and making noises before entering the bedroom.

71. It appears Defendant Havlicek intended that Defendant Sharpe would holster her weapon or had holstered her weapon when he ordered her into the bedroom to take the small knife.

72. Sending an officer into that situation while brandishing a gun was tantamount to causing a lethal encounter.

73. Instead of de-escalation this was an act of escalation and aggressiveness by the defendants that resulted in a lethal encounter where none would have occurred Defendants had simply followed their de-escalation training.

74. Defendant Sharpe had a young Black man on the ground, tased, convulsing and unresponsive to verbal commands, and yet she was triggered and aggressed by her pervasive, pre-learned and institutionalized stereotypical racial hatred against young Black men. Defendant Sharpe acted like a marine in a war zone acting in a "kill first" mode.

75. Defendant Fernandez, despite having an obscured and limited view of the events taking place from the hallway, retook the chain of command and ordered Defendants Sharpe and Havlicek to "get the knife" while she took up a position far away from the action.

76. Defendant Fernandez's actions in their totality reveal that she did not act believing lethal force was necessary and she did not discharge her weapon, but her actions were made with reckless disregard to human life and contributed to the ultimate acts that led to the death of Plaintiff's decedent.

77. As Defendant Sharpe stood directly over Bernard, who was completely defenseless, she bent down and took her gun in her right hand and held it to Bernard's chest, with the gunsight pressed against the left side of his chest.

78. Defendant Sharpe attempted to grab the small knife from Bernard, who was in a semiconscious, electrocuted state. Trying with just her left hand to grab the knife, Sharpe screamed repeatedly, then she said 'shit," indicating she

was unable to retrieve the knife from the semi-conscious Bernard, as she was essentially fighting with herself.

79. Defendant Havlicek ordered Defendant Sharpe to "get off" Bernard but Sharpe refused to follow Havlicek's direct order

80. Defendant Havlicek knew that Defendant Sharpe had escalated the matter to the point where he needed to de-escalate.

81. At approximately 8:37 a.m., Defendant Sharpe pressed her service weapon against Bernard's chest and fired a shot. The bullet appeared to remain inside Bernard's body.

82. It is customary and a common practice that when one police officer fires their weapon other officers on the scene will follow suit.

83. Here, none of the other officers fired their weapons.

84. Just as Defendant Fernandez did not discharge her weapon, Defendant Havlicek also realized that he did not need to use lethal force in this situation.

85. Upon being shot by Defendant Sharpe, Bernard rolled over in obvious distress and in terrible pain and agony.

86. Defendants had a shared responsibility and duty under law to intervene and go into de-escalation mode and force the aggressing officers named as individual Defendants to back off, order the RRT, and seek supervisory help.

Each individual defendant had the duty to intervene amongst each other to de-escalate rather than escalate and turn this minor matter into a situation where lethal force would inevitably be used.

87. As soon as Defendant Sharpe shot Bernard, she was required to go into emergency first responder mode and under law she was required to render medical aid and to call for EMA and ALS STAT. Instead, Sharpe in a clear act showing consciousness of guilt, fled the scene with her gun in hand, leaving her victim for dead in a pool of blood. This not only showed consciousness of guilt, but as a spontaneous act, revealed she had no regard for the life of a young Black male.

88. Defendant Sharpe killed so cavalierly and acted in such way that it should be seen as not just a civil wrong, but as a criminal act.

89. Nevertheless, Defendant Sharpe acted like she was the victim when she ran to flee the scene, disrupting the process of calling for and rendering medical aid.

90. Sharpe suffered no injuries aside from a few cuts resembling papercuts that were superficial, and that she herself caused.

91. Based on the bodycam footage, once the scene was secured there were officers staged around the home in all places and there were other officers yet to be identified on the front part of second floor corridor and near the

back side of the house in the hallway. None of these officers are named as

defendants at this point because the discovery is incomplete, but additional

parties made be added as individual defendants from Defendant EPD.

92. Defendant Sharpe not only failed to render first aid but also failed to call for

medical aid.

93. To make matters whose, Defendant Sharpe's decision to flee the scene

shocked and confused the other officers on scene and disrupted medical aid

procedures.

94. Instead of rendering immediate aid to a shot and dying Bernard, the officers

on scene first sought to retrieve Defendant Sharpe's gun.

95. Officers on the scene, including Defendant Havlicek, did not try and

stabilize Bernard or get EMS up to the second floor as soon as possible.

Instead, the officers, in an act of sheer torture, handcuffed a gasping Bernard

behind his back, making it even more difficult for him to breathe.

96. Defendants left Bernard on the floor for dead. There appears to some attempt

to stop the bleeding by one officer, but handcuffing Bernard behind his back

made it impossible to perform CPR.

97. Defendants knew or should have known that Bernard was not stabilized and

had been trained to a gunshot victim on a stretcher and into an ambulance as

quickly as possible. Defendants failed in this regard for many minutes, costing Bernard any chance he had at survival.

98. Meanwhile, Defendant Havlicek and the other officers desperately looked for the so-called knife. When one officer found the small, dull, lemon knife, he probably believed it was not a lethal object that would cause an officer to shoot a man, and another officer spontaneously yelled out "where's the knife?"

99. The on-scene officers seemed lackadaisical, and none were responsive to calling for or providing medical care. The failure to state over the radio that it was safe for EMS and/or ALS personnel to come to the second floor is clear from the bodycams.

100. Defendants' failure to immediately bring Bernard out of the home on a stretcher for many minutes was incomprehensible and shocks the human conscience. The Defendants failed to move quickly to get Bernard to the ambulance and there was a lack of lifesaving attempts while Bernard was wheeled to the ambulance.

101. After wasting more than 10-15 minutes handcuffing Bernard and leaving him for dead to search for a knife and secure Defendant Sharpe, EMS and ALS finally arrived.

102. Bernard was in deep agonal breathing and was not stable. This was a code red situation and EMS ordered the police to get Bernard's handcuffs off of him.

103. Finally, about 20 minutes after the shooting, the ambulance drove Bernard to Englewood Hospital. It was not until about 9:10 a.m. that Bernard arrived at the Emergency Room. Any chance to perform surgery and save his life had been robbed by Defendants' acts.

104. Defendants Fernandez, Havlicek, and perhaps the John Doe EPD officers, engaged in acts of torture against Bernard by handcuffing him and leaving him for dead.

105. Defendants Fernandez, Havlicek, and perhaps the John Doe EPD officers, tortured Bernard by handcuffing him and leaving him for dead.

106. The driving time from Bernard's home to the hospital is typically only 5-6 minutes.

107. If Bernard were Caucasian instead of Haitian then Defendants and the other officers would have gotten him to the hospital within ten minutes of the shooting.

108. The EMS personnel on-scene described the agonal breathing as Bernard fought to get oxygen to his brain, which was still active. Agonal breathing is exactly what it means. The subject was in agony fighting for oxygen as life

was ebbing and flowing passing out of him towards cardia arrest and death. The type of pain and suffering caused for those minutes is unimaginable and could have been avoided or minimized if defendants and the other EPD officers had acted according to their trainings and protocol, and with some humanity, to get EMS to provide aid earlier.

109. Doctors at the hospital pronounced Bernard dead at approximately 9:17 a.m.

110. Throughout the entire encounter that resulted in the death of Plaintiff's decedent, Defendants acted in clear violation of prior training they had recently received.

111. On December 16, 2020, New Jersey's Office of the Attorney General issued AG Directive 2020-13, a new statewide "Use of Force Policy".

112. Recognizing that a new policy alone cannot change actual policing practices, the Attorney General's Office developed a new scenario-based training that incorporates two of the premier training programs in the country: ICAT and ABLE. The new training was scenario-based and used real life situations to reinforce the key principles of the new policy, including the need to de-escalate; critical and strategic decision-making; tactics to reduce or eliminate the need to use force; and intervention to prevent other officers from improper behavior. All 38,000 New Jersey law enforcement officers were required to complete this two-day training by the end of 2021.

113. Defendants received ICAT and ABLE de-escalation training and directives received within 6-12 months of September 3, 2022. Such trainings and directives required using de-escalation in situations such as what occurred in our case. The trainings for ICAT and ABLE were done under the direction of the NJOAG and the New Jersey State Police [NJSP], and potentially other law enforcement agencies in Bergen County and statewide.

114. At the point that the scene was secure, ICAT and ABLE training require officers to deescalate the situation rather than act aggressively, but Defendants instead violently escalated the situation in clear violation of ICAT and ABLE training and directives of immediate implantation that they had just received in the 6-12 months before September 3, 2022.

115. Such trainings and directives required using de-escalation in situations such as what occurred in our case. The trainings for ICAT and ABLE were done under the direction of the OAGNJ, the New Jersey State Police [NJSP], and potentially other law enforcement agencies.

116. On December 16, 2020, according to the OAGNJ public postings, then New Jersey Attorney General Gurbir S. Grewal issued AG Directive 2020-13, a new statewide "Use of Force Policy." Recognizing that a new policy alone cannot change actual policing practices, the Attorney General's Office developed a new scenario-based training that incorporates two of the

premier training programs in the country: ICAT and ABLE. The new training was scenario-based and used real life situations to reinforce the key principles of the new policy, including the need to de-escalate; critical and strategic decision-making; tactics to reduce or eliminate the need to use force; and intervention to prevent other officers from improper behavior. All 38,000 New Jersey law enforcement officers were required to complete this two-day training by the end of 2021.

117. On December 16, 2020, according to the OAGNJ public postings, the New Jersey Attorney General described ICAT as follows: "Integrating Communications, Assessment, and Tactics (ICAT) Created by the Police Executive Research Forum (PERF) A major recurring issue in policing is officer use of force in situations when subjects are behaving erratically and often dangerously, but do not possess a firearm, such as when they are experiencing mental health or substance use crises. ICAT training is designed to equip police officers with the skills to respond to these volatile situations, by providing them with the skills needed to safely and effectively manage these encounters, especially in the critical first few moments after officers arrive. ICAT then integrates these skills and provides opportunities to practice them through video case studies and scenario-based training exercises".

118. The New Jersey Attorney General described ABLE as follows: "Active

Bystandership for Law Enforcement (ABLE) Created by Georgetown

University and others Even where written policies require officers to

intervene to prevent a fellow officer's misconduct, to help another officer

prevent mistakes, or to take action to help another officer take care of their

health and wellbeing, it can be very difficult to intervene in practice.

Officers frequently face high-stress, high stakes decisions. ABLE adapts

intervention principles from other professions such as medicine to the

policing context. Drawing from social science research and proven learning

methods, ABLE training teaches officers specific tools and skills on how to

perform these interventions in the field."

119. Every local police department in New Jersey received these trainings in late

2021 or early 2022 and issued certifications to establish that all officers were

competently trained. Attorney General Grewel made clear that the de-

escalation tactics were not to be used at an officer's discretion. Rather, de-

escalation was ordered by the OAGNJ to be used in all incidents and in

every situation without exception in any analogous situation to what was

encountered in our case. Local police in New Jersey could not opt out of this

order and policy from the OAGNJ, and Defendant EPD certified and

covenanted to the OAGNJ that it would follow the law.

120. Those analogous situations requiring de-escalation being employed by first responding officers at a scene, would include facts such as: a retreating barricaded target, a target possessing and even threatening to use a weapon such as knife but not a handgun or rifle, a secure scene in that any bystander, resident, person or victim had been made safe at the scene, and the situation that involved an erratic emotionally or mentally disturbed target. Those facts for the implementation of ICAT and ABLE de-escalation applied to every case moving forward according to Grewel and those are the facts applicable to requiring de-escalation are the facts in our case.

121. A prime example of analogous situations to our case where ICAT and ABLE implantation by local police saved lives including possibly the lives of the officers and civilians as well as the arrestee-target, played out recently at the Trenton Police Department [TPD]. According to the officers at the TPD and its public media spokesperson and Director, the public received the following press release from the TPD regarding its recent implantation of ICAT and ABLE out in the field as follows:

"Trenton, N.J. – Acting Police Director Steve E. Wilson today announced that Trenton Police officers have successfully begun integrating new state training into their de-escalation efforts to help take suspects into custody without anyone being harmed. On Nov. 10, 2021, officers responded to reports of a suspect

smashing car windows with a gun. Upon arrival, officers observed Dashawn

Bashir Smith-Murphy, 27, of Trenton, standing next to a black shotgun.

Officers used their new de-escalation training to disarm and take Smith-Murphy

into custody without anyone being harmed. On Oct. 16, 2021, officers were

dispatched to 590 New York Avenue after receiving reports of a man with a

firearm holding a woman captive. Officers surrounded the apartment and

conducted negotiations, which resulted in Eric Hardmon, 37, of Bronx, NY,

opening the door and being taken into custody without incident. Officers

entered the apartment and located a female inside the bathroom unharmed. "The

TPD is committed to using every resource available to peacefully resolve

criminal disturbances, and it wasn't long before our officers started taking

advantage of the training they just started over a month ago," said Acting

Director Wilson. "These are the types of situations where this training is

incredibly useful and can help achieve the best possible outcome for both our

officers and the residents they are sworn to protect." The TPD started de-

escalation and active bystandership training programs at Mercer County

Community College this Fall. One of the training programs is Integrating

Communications, Assessment, and Tactics (ICAT). ICAT is a training guide for

diffusing critical incidents. It provides responding police officers with the tools,

skills, and options they need to safely defuse a range of critical incidents. ICAT

instructs officers on critical thinking, crisis intervention, communications, and tactics." Trenton Police Officers Begin Executing New De-Escalation Training Out in the Field, NJ INSIDER, November 24, 2021.

122. De-escalation techniques employed in trainings include but are not limited to: 1) police are to not corner the target and close in too close on the target; police should be empathetic in tone to the target; attempt to use open ended questions, use slowdown of verbal communications, use positive reinforcement in communications, use gentle language to defuse the situation, comfort the target that consequences of actions are minor and this will all be ok, use one officer rather multiple officers to communicate, keep a safe distance from the target, do not swear or threaten the target in any way, do not miscommunicate, and offer that there will be help provided to the target by getting the trust of the target. Also, the need to call in the negotiator and SWAT also known as the RRT in Bergen County as emergency response team is standard protocol that all Defendants were required to adhere to.

123. In our case, Defendants caused the death of Plaintiff's decent with reckless disregard and refused to follow their training, including ICAT and ABLE de-escalation directives and orders.

124. Myrlene Laurince is Administrator Ad Prosequendum for Bernard's Estate, but she also suffered in her own personal capacity from Defendants causing her unthinkable severe emotional distress. Myrlene was present when Bernard was shot, and she suffered by knowing that he did not receive adequate medical care. She was also prevented from being with Bernard during his final moments and was unable to comfort him. Thereafter, deeper distress occurred when she learned at the hospital that her son had died. Thus, Plaintiff Myrlene Laurince seeks damages for claims of negligent and intentional infliction of emotional distress.

125. The Estate of Bernard Placide has spent in excess of $15,000 for a second autopsy and burial expenses.

126. Under New Jersey law and NJOAG guidelines, the NJOAG took over any and all criminal investigations into the case. There will be a Grand Jury proceeding, but the NJOAG has not indicated whether the matter has been sent before the Grand Jury or is awaiting to be presented to the Grand Jury.

127. The NJOAG also not provided any discovery in this matter except for the four partially redacted videos, and 911 call, along with a partially redacted radio communication from the 911 dispatcher.

128. With regard to the administrative internal affairs [IA] investigations, those were short-circuited by the Caucasian supervisors of Defendant EPD, with

the approval or acquiescence of Defendant Englewood, and were never

conducted in an impartial fashion.

129. The EPD IA Unit conducted no legitimate investigation.

130. Instead of a real IA investigation, or at least a deferring of the IA

investigation until after the NJOAG acts on the criminal matter, Defendant

EPD brazenly applauded Defendants' misconduct. There were no

terminations and no suspensions of any of the three individually named

defendants.

131. In fact, Defendants tried to promote Defendant Sharpe to the position of

Detective.

132. African American leaders avidly protested Defendant Sharpe's promotion,

and this temporarily blocked her from receiving a ceremony and increased

pay. However, Sharpe is working in the detective bureau today and is

identified as a detective by the force and the public. Defendant EPD's act of

promoting Sharpe and putting the other two individually named Defendants

back on the streets with no punishment has fueled intense pain and suffering

for Bernard's loved ones, including his brothers, cousins, aunts, grandfather,

and mother.

133. Sadly, what happened to Plaintiff's decedent was not unexpected. In post suit

discovery, Defendants Sharpe and Havlicek will be exposed as being unfit

for retention and continued employment based on this event and other events revealing racial hatred for Black men. City of Englewood and EPD personnel have a long history of visiting pervasive, invidious racial discrimination. High level officials at Defendant City of Englewood and Caucasians in power at the EPD, including the Chief of Police and Deputy Chief of Police, consistently favor Caucasian police officers over their Black peers. This has spilled out in the public arena as case after case reveals intense racial division occurring at the EPD. The racial resentment is so pervasive at the EPD that superior officials have weaponized the Black Officers' Union activities and union participation pitting the Fraternal Order of Police [FOP] against Police Benevolent Association, where many Englewood Police Officers have gone to the FOP seeking protection from the racist acts of Caucasians in power at the EPD. Defendant Sharpe, Fernandez, and Havlicek are predictably aligned with the Caucasian officers who are in power at the EPD.

### Count I - 42 U.S.C. §1983 - Fourth, Eighth, Ninth, and Fourteenth Amendment Equal Protection Violations

*Plaintiff v. Defendants Sharpe, Havlicek, Fernandez, Individually and in Their Official Capacities, and against Defendants City of Englewood and the Englewood Police Department*

134. Plaintiff incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

135. The conduct by the officers identified in this Count and described herein constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, and clearly established law.

136. Such conduct also establishes imputed or vicarious liability for the entity defendants City of Englewood and the Englewood Police Department.

137. The conduct by the officers identified in this Count also constituted cruel and unusual punishment in violation of the Eighth Amendment, violated the penumbra of rights guaranteed by the Ninth Amendment, and also violated the Equal protection clause of the Fourteenth Amendment because racism against a young Black male was a motivating factor in the misconduct perpetrated by the Defendants.

138. At all material times, Defendants Sharpe, Havlicek, and Fernandez were each acting under color of state law, as agents of Defendant Englewood Police Department, and within the scope of their employment and authority as duly certified law enforcement officers of Defendant City of Englewood.

139. At all times material hereto, each individually named Defendant at the scene were at different times acting in a supervisory capacity and directly participated in violating Bernard Placide's federal rights. Defendants Sharpe, Havlicek and Fernandez are therefore liable in their individual capacities, in

their supervisory capacities, and in their official capacities as law enforcement officers.

140. At all material times, defendants Sharpe, Havlicek and Fernandez had no reason to believe that lethal force was to be employed, and further ore that these three individually named Defendants used excessive force in deploying the taser device against Bernard.

141. This Count implicates as excessive force the use of the taser and lethal force through shooting Bernard in the chest with a handgun by Defendants Sharpe, Havlicek, and Fernandez.

142. At all material times, Defendants Sharpe, Havlicek, and Fernandez did not have a reasonable fear of imminent bodily harm when the taser was deployed against Bernard and when Defendant Sharpe shot Bernard in the chest at close range with her automatic weapon.

143. Defendants Sharpe, Havlicek, and Fernandez had no reasonable belief that any other person was in danger of imminent bodily danger from Bernard since the scene was secured and made safe at the time Bernard was tased and shot by a handgun in an act of lethal force.

144. Every reasonable officer would have known that using lethal force and deploying the taser against a retreating target that became barricaded at a secure scene constitutes excessive force in violation of the Fourth

Amendment, and is in violation of the Eighth, Ninth, and Fourteenth Amendments to United States Constitution.

145. Defendants Sharpe, Havlicek, and Fernandez's deployment of the taser and the use of deadly lethal force by shooting Bernard in the chest at close range use of deadly force was objectively unreasonable and violated clearly established law.

146. With regard to deployment of the taser and its use against a nearly naked human being, the use of such force must be justified by a strong governmental interest that compels its use. The Defendant officers created their own danger on their own volition seeking to escalate the encounter with Bernard rather than following trainings and deploying de-escalation tactics designed to save lives.

147. Defendants Sharpe, Havlicek, and Fernandez all are liable for this civil rights violation individually and jointly.

148. As a result of Defendants Sharpe, Havlicek, and Fernandez's unjustified, excessive, and illegal use of the taser and for use of deadly force, Bernard experienced conscious pain and suffering, including but not limited to a lengthy suffering period involving unthinkable pain and agonal breathing as his life ebbed and flowed as Bernard lost oxygen to the brain and ultimately

was pronounced dead at the hospital approximately forty (40) minutes after he was tased and shot.

149. As a result of Defendants Sharpe, Havlicek, and Fernandez's unjustified, excessive, illegal, and deadly use of force, Bernard died after a long period of suffrage.

150. None of the Defendant Officers ever had a reasonable fear of imminent bodily harm, nor did they have a reasonable belief that any other person was in danger of imminent bodily danger from Bernard at any point in time.

151. The Defendant officers owed Bernard a duty, and breached that duty, causing his death.

152. The Defendant officers acted willfully, maliciously, in bad faith, and in reckless disregard of Bernard's protected constitutional rights, and did so with shocking and willful indifference to Bernard's rights and with conscious awareness that tasing and shooting Bernard would cause bodily harm and death.

153. The handcuffing of Bernard behind his back as he lay in agonal breathing for an extended period is herein made a part of the Count One claim.

154. As a direct and proximate result of the acts and omissions described herein, Bernard suffered compensatory and special damages as defined under federal statute and common law and in an amount to be determined by jury. Such

damages include but are not limited to those damages indicated under New Jersey's wrongful death and survivor action clauses.

155. Punitive damages are available against Defendants and will be sought to the fullest measure allowed under law.

156. Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under Lodestar and pursuant to 42 U.S.C. § 1988, as this is a fee shifting case.

157. The conduct described in all of the preceding paragraphs amounts to wrongful acts and omissions in violation of New Jersey and federal law. The deliberate and intentional acts of misconduct by the Defendant officers denies these Defendants any defense or claim of qualified or absolute immunity, and such misconduct binds Defendants Englewood and the EPD's liability vicariously with no claim for qualified or absolute immunity.

158. As a direct and proximate result of these wrongful acts and omissions, Bernard's next of kin have suffered pecuniary loss as Bernard's future income over his life will not be gained, including medical and funeral expenses, loss of aid, counsel, guidance, companionship, advice, assistance, love, protection, and support in an amount to be determined by jury.

### Count II - 42 U.S.C. §1983 - FAILURE TO INTERVENE
### Fourth, Eighth, Ninth, and Fourteenth Amendment
### Equal Protection Violations
*Plaintiff v. Defendants Sharpe, Havlicek, Fernandez, Individually and in Their Official Capacities, and against Defendants City of Englewood and the Englewood Police Department*

159. Plaintiff incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

160. The conduct by the officers identified in this Count and described herein constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, and clearly established law.

161. Such conduct also establishes imputed or vicarious liability for the entity defendants City of Englewood and the Englewood Police Department.

162. The conduct by the officers identified in this Count also constituted cruel and unusual punishment in violation of the Eighth Amendment, violated the penumbra of rights guaranteed by the Ninth Amendment, and also violated the Equal protection clause of the Fourteenth Amendment because racism against a young Black male was a motivating factor in the misconduct perpetrated by the defendants.

163. At all material times, Defendants Sharpe, Havlicek, and Fernandez were each acting under color of state law, as agents of the defendant Englewood Police Department, and within the scope of their employment and authority as duly certified law enforcement officers of Defendant City of Englewood.

164. At all times material hereto, each individually named Defendant at the scene were at different times acting in a supervisory capacity and directly participated in violating Bernard Placide's federal rights. Defendants Sharpe,

Havlicek and Fernandez are therefore liable in their individual capacities, in their supervisory capacities, and in their official capacities as law enforcement officers.

165. In addition to these uses of unjustified, excessive, illegal, and deadly uses of force, each of the Defendant Officers had a duty to intervene on behalf of a citizen whose constitutional rights were being violated in their presence by another officer.

166. The Defendant officers Sharpe, Havlicek, and Fernandez all recognized that the force being used and the failure to follow ICAT and ABLE training, including but not limited to Tasing and shooting Bernard with lethal force using an automatic handgun acting under color of law.

167. Defendants Sharpe and Fernandez each observed and were in a position to intervene to stop Defendant Havlicek's use of excessive force through use of the taser. Defendants Havlicek and Sharpe has a duty to defy Defendant Fernandez's unreasonable order to deploy the taser. Defendants Fernandez and Havlicek and other John/Jane Doe/s Englewood officers had a duty to stop Defendant Sharpe from entering the bedroom of Bernard and were required under law to stop Defendant Sharpe from using excessive force in pointing and shooting the firearm into Bernard's chest causing his death.

168. The Defendant officers Sharpe, Havlicek, and Fernandez's multiple failure to intervene to stop the escalatory acts of each other, the tasing and shooting of Bernard leading to the use of constitutionally unreasonable deadly force violated Bernard's Fourth Amendment rights, and the other constitutional rights cited in Count One.

169. As a result of the failure to intervene by the Defendant officers Sharpe, Havlicek, and Bernard experienced unthinkable and dramatic conscious pain and suffering and such misconduct caused additional conscious pain and suffering including but not limited to the being struck with the maximum or in excess of the allowable maximum voltage taser force, then lying in an electrocuted state, being shot in the chest, having extended loss of oxygen and lengthy agonal breathing while being handcuffed behind his back.

170. As a result of The Defendant officers Sharpe, Havlicek, and Fernandez's unjustified failure to intervene in the excessive use of force as described in Counts One and Two above and in the body of this Complaint, Bernard suffered greatly and died.

171. As a direct and proximate result of these wrongful acts and omissions, Bernard's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance,

protection, support, and what is provided as to pain and suffering recoverable under Survivor action law in an amount to be determined by jury.

## Count III - 42 U.S.C. §1983 - FAILURE TO TIMELY SEEK AND PROVIDE LIFE SAVING MEDICAL CARE - Fourth, Eighth, Ninth, and Fourteenth Amendment Equal Protection Violations

*Plaintiff v. Defendants Sharpe, Havlicek, Fernandez, Individually and in Their Official Capacities, and against Defendants City of Englewood and the Englewood Police Department*

172. Plaintiff incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

173. The conduct by the officers identified in this Count and described herein constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, and clearly established law.

174. Such conduct also establishes imputed or vicarious liability for the entity defendants City of Englewood and the Englewood Police Department.

175. The conduct by the officers identified in this Count also constituted cruel and unusual punishment in violation of the Eighth Amendment, violated the penumbra of rights guaranteed by the Ninth Amendment, and also violated the Equal protection clause of the Fourteenth Amendment because racism against a young Black male was a motivating factor in the misconduct perpetrated by the defendants.

176. At all material times, Defendants Sharpe, Havlicek, and Fernandez were each acting under color of state law, as agents of the defendant Englewood Police Department, and within the scope of their employment and authority as duly certified law enforcement officers of Defendant City of Englewood.

177. At all times material hereto, each individually named Defendant at the scene were at different times acting in a supervisory capacity and directly participated in violating Bernard Placide's federal rights. Defendants Sharpe, Havlicek and Fernandez are therefore liable in their individual capacities, in their supervisory capacities, and in their official capacities as law enforcement officers.

178. In addition to these uses of unjustified, excessive, illegal, and deadly uses of force, each of the Defendant Officers had a duty to intervene on behalf of a citizen whose constitutional rights were being violated in their presence by another officer.

179. Also, the Defendant officers had a duty under law as first aid responders to perform the following lifesaving acts after Bernard was shot: a)immediately call for ALS and EMS aide; b) render first aid as trained to do; c) immediately remove Bernard from the premises into the ambulance when he was determined to be unstable and suffering from agonal breathing; d) at a minimum clear the area for EMS and ALS to enter the premises and location

where Bernard was located; and e) refrain from handcuffing a near death shooting victim that was incapacitated and in agonal breathing because of its negative affect on the person's chance to survive.

180. Defendant Sharpe fled the scene and provided no medical care and in fact delayed, confused, hindered, and obstructed the stage when rendering and getting Bernard emergency medical aid and EMS and ALS quickly could make the difference between life and death.

181. Defendant officers all acted objectively unreasonably in delaying making the call for EMS/ALS to render emergency medical care, and failed to clear the scene so EMS and ALS could ascend to the second floor of the premises where Bernard lay fighting for his life.

182. Defendant officers also failed to render appropriate medical care to Bernard, and failed to immediately get Bernard out of the premises to the ambulance due to him being deemed unstable at the scene.

183. The Defendant officers Sharpe, Havlicek, and Fernandez's multiple failures to timely call for and provide EMS with timely access to Bernard, and the failures of the Defendant officers to deploy appropriate emergency medical aid violated Bernard's Fourth Amendment rights, and the other constitutional rights cited in Count One.

184.  As a result of Defendant officers Sharpe, Havlicek, and Fernandez's multiple failures to timely call for and provide EMS with timely access to Bernard, and the failures of the Defendant officers to deploy appropriate emergency medical aid, Bernard experienced unthinkable and dramatic conscious pain and suffering and such misconduct caused additional conscious pain and suffering, having extended the time period of a loss of oxygen and lengthening the time where agonal breathing occurred, while being handcuffed behind his back, causing and contributing pain and suffering and death.

185.  As a direct and proximate result of these wrongful acts and omissions, Bernard's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, support, and what is provided as to pain and suffering recoverable under Survivor action law in an amount to be determined by jury.

## Count IV - 42 U.S.C. §1983 - RACIAL DISCRIMINATION - Fourth, Eighth, Ninth, and Fourteenth Amendment Equal Protection Violations

*Plaintiff v. Defendants Sharpe, Havlicek, Fernandez, Individually and in Their Official Capacities, and against Defendants City of Englewood and the Englewood Police Department*

186.  Plaintiff incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

187. Defendants, as the Complaint's facts address, employed a racial ingrained stereotype treating similarly situated Black males differently than Caucasian offenders similarly situated.

188. The claims made against the Defendants also consist of a Fourteenth Amendment equal protection caused by Defendants' acts to racially profile Bernard in a manner that violated his constitutional rights and denied him equal protection under the law.

189. Had the offender been Caucasian, ICAT and ABLE training and de-escalation tactics would have been employed, and Bernard would be alive today facing minor third degree state charges in New Jersey with a presumption of non-incarceration.

190. The racial profiling utilized by the Defendants were the proximate cause of Bernard's pain and suffering and his death.

191. As a direct and proximate result of these wrongful acts and omissions, Bernard's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, support, and what is provided as to pain and suffering recoverable under Survivor action law in an amount to be determined by jury

**Count V - 42 U.S.C. §1983 - STATE CREATED DANGER**

## Fourth, Eighth, Ninth, and Fourteenth Amendment Due Process and Equal Protection Violations

*Plaintiff v. Defendants Sharpe, Havlicek, Fernandez, Individually and in Their Official Capacities, and against Defendants City of Englewood and the Englewood Police Department*

192. Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

193. The Defendants in this Count are alleged to have violated federal civil rights law referred to as state-created danger.

194. The state-created danger legal doctrine holds that a law enforcement officer can be held liable for injuries or deaths that occur because of a danger that the officer created. If the police did something or failed to do something in a way that they knew would bring about obvious danger to a person and some harm befell the affected party, police can be held liable for the harm done to the injured party.

195. This legal doctrine is premised on the idea that the individual would not be subjected to the danger or to the increased danger if police would not have acted in the manner in which they acted or failed to act. Unlike the "special relationship" doctrine, the affected party does not need to be in police custody in order for this doctrine to apply.

196. Defendant officers in our case created by their own unlawful aggressive and escalatory acts a state created danger targeting Bernard, and the Defendant

officers left Bernard in a situation that was more dangerous than in the situation he was in before police encountered the subject.

197.  The Defendant officers caused a danger that was not present before the encounter and unlawfully and unreasonably increased the danger.

198.  The state created danger exhibited and caused by the Defendant officers were the proximate cause of Bernard's pain and suffering and his death.

199.  As a direct and proximate result of these wrongful acts and omissions, Bernard's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, support, and what is provided as to pain and suffering recoverable under Survivor action law in an amount to be determined by jury.

## Count VI - 42 U.S.C. §1983 - *MONELL* LIABILITY

*Plaintiff v. City of Defendants Englewood and the Englewood Police Department*

200.  Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

201.  Under New Jersey law [Police Chief Powers Act, N.J.S.A. 40A], Defendant City of Englewood and Defendant EPD share control over law enforcement services provided in Englewood for its citizenry.

202. The Defendants in a shared relationship provide for the establishment, maintenance, appointment, removal, discipline, control, and supervision of the Englewood police force.

203. The Defendants subject to the limitations herein contained and the provisions of the Civil Service chapter of this Charter, and may make all needful rules and regulations for the efficiency and discipline, and promulgate and enforce general and special orders for the government of the same, and have the care and custody of all public property connected with the Police Department of the City.

204. The Defendants acting through their alter egos, the highest level officials in their respective divisions between the City and the EPD had final policymaking authority with regard to establishing written policies and training programs governing the conduct of its police force performing policing functions on behalf of the City of Englewood.

205. Defendant City of Englewood and the Defendant EPD as an arm of the Englewood government makeup established and/or approved of written policies and training governing the conduct of police force performing policing functions.

206. The written policies and training established in Englewood constitute the official policy of the Defendants EPD and Englewood and were the moving force behind and caused Bernard's injuries.

207. The Defendants EPD and Englewood acting by and through its highest level officials, had knowledge of unconstitutional patterns and practices and knowledge that the same gave rise to a risk of violations of citizens' federal rights, particularly the rights of young Black males.

208. The Defendants EPD and Englewood, acting by and through its highest level officials and other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from EPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

209. Defendants EPD and Englewood tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the safety of young Black males during arrest, including but not limited to the use of excessive force and taser deployment, the handcuffing, and the restraint process.

210. Defendants Englewood and EPD acting with deliberate indifference to the rights of targets, arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices

that condoned and required officers to turn a blind eye to and not intervene and stop and thwart the use of excessive force by Englewood officers.

211. On and/or prior to September 3, 2022, Defendant Englewood and Defendant EPD, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered or ratified a number of customs, patterns, or practices that condoned and required officers to treat the members of the Black Community of Englewood differently, including but not limited to implementing the deployment of escalatory police force, the deployment of tasers, and the deployment of deadly force at a higher rate against Black men who did not pose a threat to officers.

212. On and/or prior to September 3, 2022, Defendant Englewood and Defendant EPD acted with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

213. Defendants Englewood and EPD upper echelon officials lied to the NJOAG and the citizenry of New Jersey when these entities and their officers from Englewood swore to follow ICAT and ABLE training. This reckless and intentional disregard for de-escalation policies to be implemented immediately in late 2021 was the proximate cause of Bernard's death.

214. On and/or prior to September 3, 2022, Defendant City of Englewood and Defendant EPD with deliberate and intentional indifference to Black males such as Bernard, refused to use ICAT and ABLE training in its police encounters because it was in contravention of employing excessive force against Black males which was the custom and policy of the Defendants Englewood and EPD.

215. On and/or prior to September 3, 2022, Defendant Englewood and Defendant EPD with deliberate indifference to the rights of arrestees, detainees, and the like, continued to employee Defendants Fernandez, Sharpe, and Havlicek before and after September 3, 2022, despite knowledge of their unconstitutional, unlawful, or other improper conduct.

216. Discovery will surface in discovery as to the additional claims that the Defendant officers were negligently hired. At this time all of the IA and personnel files of the Defendant officers named in this action are confidential and are not open to public review.

217. Defendant Englewood and Defendant EPD had to the power to terminate or appropriately discipline the Defendant officers for their misconduct on September 3, 2022, but failed to do so despite Defendant Englewood and/or Defendant EPD's actual or constructive knowledge that the Defendant

officers were prone to use excessive force and not follow ICAT and ABLE
training when encountering a Black male.

218. By refusing to terminate the Defendant officers, and in an act of promoting
Defendant Sharpe to the detective Bureau in an unconscionable act, the EPD
officers all act with impunity and without fear of retribution. In fact, the
promotion of Sharpe causes EPD officers to conclude that applying excessive
force to Black males and even killing Blacks unlawfully is a ticket to a
promotion to the Detective Bureau.

219. It is asserted that the upper echelon Caucasian Defendant EPD and
Englewood officials are motivated by a racist belief that Caucasians are
superior to Blacks, and that Black males are inherently more dangerous that
Caucasian offenders and are to be treated as such.

220. On and/or prior to September 3, 2022, Defendant Englewood and Defendant
EPD failure to terminate or properly discipline Defendant officers Is a part of
its larger custom, police, or practice of failing to supervise, terminate, or
properly discipline its officers for unconstitutional, unlawful, or otherwise
improper conduct, and thereby encouraged EPD officers to continue
engaging in unlawful acts towards arrestees and targets, including Bernard.

221. The unconstitutional policies, practices, and customs defined herein were the
moving force behind Bernard's death.

222.  Bernard died as a direct and proximate result of the acts and omissions by

Defendants EPD and Englewood through their upper echelon Caucasian

officials.

223.  As a direct and proximate result of the acts and omissions described herein,

Bernard suffered compensatory and special damages as defined under federal

common law and in an amount to be determined by jury.

224.  Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees,

under 42 U.S.C. § 1988.

225.  As a direct and proximate result of these wrongful acts and omissions,

Bernard's next of kin have suffered pecuniary loss, including medical and

funeral expenses, loss of aid, counsel, guidance, advice, assistance,

protection, support, and what is provided as to pain and suffering recoverable

under Survivor action law in an amount to be determined by jury.

## Count VII - 42 U.S.C. §1983 - *CANTON* LIABILITY

*Plaintiff v. City of Englewood and the Englewood Police Department*

226.  Plaintiff hereby incorporates and re-alleges all preceding paragraphs as

though fully pleaded herein.

227.  Defendant City of Englewood and Defendant EPD failed to properly train or

modify its training to Defendant officers and its other officers, including but

not limited to, matters related to the reasonable and appropriate use of force

during such arrests, and intervention in the excessive use of force by fellow officers.

228. Effectuating an arrest, using force to effectuate an arrest, and intervening in the use of force is a usual and recurring situation with which EPD law enforcement officers and other agents encounter on a regular basis.

229. As such, Defendant City of Englewood and Defendant EPD were aware of a need for more and different training. Defendant Englewood and Defendant EPD specifically knew that its officers needed training regarding the use of de-escalation training known as ICAT and ABLE, and the Defendant Englewood and Defendant EPD upper echelon officials only received this training because it was ordered by the NJOAG. Unfortunately, the upper echelon officials for Defendant Englewood and Defendant EPD refused to change its racist polices against using de-escalation against Black male suspects

230. With deliberate indifference to the rights of citizens, Defendant City of Englewood and Defendant EPD failed to apply the training that the officers had received and acted with deliberate and intentional indifference in this regard.

231.    Defendant City of Englewood and Defendant EPD were that deprivation of the constitutional rights of citizens was likely to result from its lack of training and the failure to modify its training.

232.    As such, Defendant Englewood and Defendant EPD were deliberately indifferent and exhibited reckless disregard with respect to the potential violation of constitutional rights.

233.    The failure to train and/or to appropriately modify training/ and/or ignore ICAT and ABLE training to ensure that the Englewood police continued using racial profiling and excessive force against Black men constituted official and unofficial policies, practices, or customs of Englewood's police force.

234.    These afore stated failures and attachment and lust towards continuing racist polices was behind the acts and omissions the Defendant officers made toward Bernard.

235.    As a direct and proximate result of Defendant City of Englewood and Defendant EPD  acts and omissions, Bernard suffered injuries, experienced pain and suffering, and ultimately died.

236.    As a direct and proximate result of the acts and omissions described herein, Bernard suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

237.   Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

238.   As a direct and proximate result of these wrongful acts and omissions, Bernard's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, support, and what is provided as to pain and suffering recoverable under Survivor action law in an amount to be determined by jury.

## Count VIII - NEW JERSEY CIVIL RIGHTS ACT
## N.J.S.A. 10:6-1 et seq.

*Plaintiff v. Defendants Sharpe, Havlicek, Fernandez, City of Englewood and the Englewood Police Department*

239.   Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

240.   The Defendant officers acting under color of law acted in clear violation of the New Jersey Civil Rights Act [NJCRA], N.J.S.A. 10:6-1 et seq.

241.   N.J.S.A. 10:6-1 to -2 applies not only to federal rights but also to substantive rights guaranteed by New Jersey's Constitution and laws. The New Jersey Civil Rights Act provides, in relevant part, that: Any person who has been deprived of any substantive due process or equal protection rights, privileges

or immunities secured by the Constitution or laws of the United States, or any substantive rights is protected under NJCRA.

242. If the privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, the aggrieved party may bring a civil action for damages and for injunctive or other appropriate relief. [N.J.S.A. 10:6-2(c) (emphasis added).]

243. Under NJCRA, a right to liberty is protected by the Fourteenth Amendment. The Fourteenth Amendment analysis under NJCRA and Sec. 1983 is the same. That Amendment provides, among other things, that "no State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Due Process Clause guarantees more than fair process"; it "provides heightened protection against government interference with certain fundamental rights and liberty interests."

244. Plaintiff is seeking to vindicate under NJCRA, its Fourth, Fifth, Eighth, Ninth and fourteenth Amendment due process and equal protection rights under the law as well as those rights established in the body of the New Jersey Constitution.

245.   The due process right that plaintiff asserts here is the right to be free from excessive use of force, a failure to intervene, a failure to offer or call timely for medical aid, the creation of racial profiling and state created danger.

246.   In this NJCRA cause of action, Plaintiff has presented the necessary elements to satisfy the following four-prong test: (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actors acted with a degree of culpability that shocks the conscience; (3) a relationship between the State and the Plaintiff existed such that the Plaintiff was a foreseeable victim of the Defendant/s acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

247.   The Defendant officers are all sworn law enforcement officers acting on behalf of the EPD and Englewood Defendants and these Defendants jointly and severally violated Plaintiff's rights under the express provisions and full protections provided in NJCRA.

248.   As a direct result of the foregoing events committed by Defendants and their upper echelon officials and designees, these Defendants jointly and severally

caused the death of Bernard and caused unthinkable pain and suffering recoverable by the survivors of Bernard.

249.  As a direct result of these aforesaid actions of Defendants and their upper echelon officials and designees, these Defendants jointly and severally acted with deliberate indifference to Bernard's safety and due to affirmative acts taken, and acts of willful indifference, Plaintiff has suffered and seeks the following damages: a. Compensatory damages; b. Punitive damages ;c. Attorney costs and fees under the reverse fee statute; d. Pecuniary damages including, loss of future wages, attending interest, e. Emotional distress damages for next of kin of Plaintiff's Estate; f. Pain and suffering; g. Permanent damages h. Pain and suffering of Bernard;

## Count IX - WRONGFUL DEATH

*Plaintiff v. Defendants Sharpe, Havlicek, Fernandez, City of Englewood and the Englewood Police Department*

250.  Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

251.  The Defendant officers, acting under color of state law, deprived Plaintiff's decedent of rights, privileges, and immunities secured by the Constitution of the United States, including those secured by the Fourth and Fourteenth Amendments to the Constitution, by:

(a) Seizing the decedent without probable cause; and/or

(b) Subjecting the decedent to excessive force.

252.  The aforesaid wrongful acts of Defendants directly and proximately caused the death of the decedent.

253.  At the time of his death, the decedent was 22 years old and in good physical health.

254.  Defendants owed Plaintiff a duty of reasonable care. That duty was breached by the Defendants based on their acts of misconduct . Defendants' actions in escalating the encounter with Bernard, deploying the taser and shooting Bernard with an automatic weapon, failing to intervene, and failing to timely call for and apply emergency medical care was the proximate cause of Bernard's death.

255.  Plaintiff is a proper party with standing pursuant to N.J.S.A. 2A:31-1, et seq. (incorporated herein by virtue of 42 U.S.C. § 1988), to pursue remedies for wrongful death, including pecuniary loss and other compensable injuries resulting from loss of the care, comfort, society, attention, services, and support of the decedent.

256.  Plaintiff, as the representative of the survivors of the decedent, Bernard Placide, seeks money damages from the defendant for the actual financial

losses the survivors have suffered, and will suffer in the future, as a result of the decedent's death caused by the wrongful acts of the Defendants.

257.   Plaintiff may recover under the New Jersey Wrongful Death Act and has suffered actual financial losses.

258.   Pecuniary loss is defined by the New Jersey Wrongful Death statute and cases interpreting the statute [N.J.S.A. § 2A: 31-1 et seq.].

259.   As a further proximate result of Defendants' acts, Plaintiff has incurred expenses, including burial expenses.

260.   The fact that Plaintiff may have committed a crime does not bar a claim under this law.

261.   Defendants EPD and Englewood are liable under an imputed or vicarious liability theory as proscribed by new Jersey tort laws.

262.   As a direct result of the foregoing events committed by Defendants and their upper echelon officials and designees, these Defendants jointly and severally caused the death of Bernard and caused unthinkable pain and suffering recoverable by the survivors of Bernard.

263.   As a direct result of these aforesaid actions of Defendants and their upper echelon officials and designees, these Defendants jointly and severally acted with deliberate indifference to Bernard's safety and due to affirmative acts

taken, and acts of willful indifference, Plaintiff has suffered and seeks damages.

264. Damages sought in this Count by Plaintiff's survivors are described as the amount of income Bernard would have actually earned in the future and contributed to his survivors.

265. Plaintiff also seeks damages for loss of service which is the reasonable economic value of the loss of services, assistance, guidance and training that Bernard at 22 years of age would have provided to his siblings and mother Myrlene Laurince over the course of their lives.

266. Plaintiff also seeks damages for funeral and other related expenditures including the second autopsy, paying for the headstone the gravesite plot, and the medical expenses incurred.

267. Plaintiff also seeks punitive damages for the egregious acts of the Defendants as indicated in the body of the Complaint.

## <u>Count X - SURVIVAL ACTION</u>

*Plaintiff v. Defendants Sharpe, Havlicek, Fernandez, City of Englewood and the Englewood Police Department*

268. Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

269. The Defendant officers unreasonably seized Plaintiff's decedent, lacking probable cause, and/or by means of excessive force.

270. At the time of the complained of events, Plaintiff's decedent had a clearly established right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

271. Plaintiff's decedent also had a clearly established constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement.

272. Any reasonable police officer knew or should have known of these rights at the time of the complained of events.

273. Defendants' use of force was objectively unreasonable in light of the facts and circumstances confronting him.

274. Without any justification and/or provocation, Defendants intentionally, willfully, maliciously, and with deliberate indifference to the decedent's constitutional rights, directly and proximately caused the decedent to suffer grievous injuries that resulted in death, emotional pain and suffering, and a loss of the enjoyment of life and other hedonic damages.

275. The foregoing claim for relief arose in the decedent's favor, and the decedent would have been the plaintiff with respect to this claim had he lived.

276.   Plaintiff may recover under the New Jersey Survivor Act and has suffered actual financial losses.

277.   Plaintiff is a proper party with standing pursuant to N.J.S.A. 2A:15-3, et seq. (incorporated herein by virtue of 42 U.S.C. § 1988), to pursue the decedent's remedies for this claim.

278.   Plaintiff, as the representative of the survivors of the decedent, seeks to recover the pain and suffering that Bernard Placide would have recovered had he survived the encounter with the Defendants as allowable under New Jersey and/or federal law in a Survivor Action.

279.   Plaintiff also seeks punitive damages for the egregious acts of the Defendants as indicated in the body of the Complaint.

## Count XI - NEGLIGENT SUPERVISION/MANAGEMENT/RETENTION

*Plaintiff v. Defendants City of Englewood and the Englewood Police Department*

280.   Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

281.   All named Defendants at all relevant times committed federal and state civil rights violations and torts against Plaintiff and Plaintiff's decedent, Bernard Placide, through the use of law means for unlawful purposes and/or by the commission of unlawful acts by unlawful means.

282.  In the process of violating Bernard's rights as are stated in body of the
      Complaint above, Defendants committed the tort of Negligent
      Management/Supervision/Retention of Defendants Sharpe, Havlicek, and
      Fernandez.

283.  Any action for negligent hiring will be addressed, if necessary, in a Motion
      to file an Amended Complaint once confidential civil discovery hiring
      records, personnel and service records, and IA files of these Defendant
      officers is received and inspected.

284.  As a direct result of the willful misconduct, active participation, willful
      indifference, and negligence on the part of the Defendants named in the
      cause of action, Plaintiff's decedent died.

285.  No Defendant public entity named above has taken any action to redress the
      use of excessive force and other civil rights violations committed against the
      Plaintiff's decedent,  although all these Defendants have knowledge of the
      events described in this Complaint, and they had/have the power, authority,
      and legal responsibility to take remedial action. All named Defendant public
      entities through action and/or inaction have compounded the unlawful and
      tortious behavior that serves the basis of this cause of action.

286.  Punitive damages are sought in this matter for the reasons stated in the preceding sections of this Complaint and are incorporated by reference as if stated in full herein below.

287.  Plaintiffs seek liability against Defendants EPD and Englewood entities under an imputed and vicarious liability theory.

288.  As a direct result of these aforesaid actions of the Defendant/s, their agents, employees, and servants, and as a direct result of their malicious and intentional wrongful or negligent tortious conduct, plaintiff suffered pain and suffering and died and seeks the following:

    a. Compensatory damages including pain and suffering and loss of enjoyment  of life;

    b. Punitive damages;

    c. Attorney costs and fees;

    d. Pecuniary damages including, any loss of future wages and attending interest as a result of the tortious behavior.

    e. All other damages available under the appropriate Model Jury Charge.

    f. Pain and suffering incurred and for any other damages caused on account of other tortious conduct, emotional damages, physical damages, and loss of enjoyment and life and pain and suffering.

## Count XII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Plaintiff Myrlene Laurince in her individual capacity v. Defendants Sharpe, Havlicek, Fernandez, City of Englewood and the Englewood Police Department*

289.    Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

290.    All named Defendants at all relevant times committed civil rights violations and torts against Plaintiff's decedent, Bernard Placide, through the use of law means for unlawful purposes and/or by the commission of unlawful acts by unlawful means.

291.    In the process of violating the rights of Plaintiff's decedent, as are stated in this Complaint above and incorporated by reference as if stated in full herein, Defendants committed the tort of intentional infliction of emotional distress.

292.    The tort of intentional infliction of emotional distress exists in that Plaintiff suffered physical pain and suffering and agony and died as a result of Defendants' intentional and outrageous conduct. Such conduct in this cause of action involves conduct beyond the bounds of decency, which is considered atrocious and completely intolerable in a civilized society.

293.    Defendants acted intentionally or recklessly. More specifically, Defendants acted intentionally either to: (1) to do the act and to produce the emotional distress; or (2) defendants acted recklessly in deliberate disregard of a high

probability that emotional distress would follow from their actions by the aforesaid ensuing conduct.

294.   As a direct and proximate result of the intentional acts of the Defendants, as stated before, Plaintiff, was caused to be injured and died as a direct result of the aforesaid dangerous acts committed by the Defendants, and was intended to cause Plaintiff severe pain and suffering and death.

295.   In addition, Myrlene Laurince, the biological mother and chief care giver for Bernard, was present at the scene of the deadly incident, and as the Complaint states, Plaintiff Laurince seeks intendent damages for her own emotional distress which has persisted and is permanent.

296.   As a direct result of the willful misconduct, active participation, willful indifference, and negligence on the part of the Defendants named in the cause of action, the Plaintiff's decedent died.

297.   No Defendant public entity named above has taken any action to redress the use of excessive force and other civil rights violations committed against the Plaintiff,  although all these Defendants have knowledge of the events described in this Complaint, and they had/have the power authority, and legal responsibility to take remedial action. All named defendant public entities through action and/or inaction have compounded the unlawful and tortious behavior that serves the basis of this cause of action.

298.   Plaintiff seeks liability against Defendants EPD and Englewood entities

under an imputed and vicarious liability theory.

299.   Punitive damages are sought in this matter for the reasons stated in the

preceding sections of this Complaint and are incorporated by reference as if

stated in full herein.

300.   As a direct result of these aforesaid actions of the Defendant/s, their agents,

employees, and servants, and as a direct result of their malicious and

intentional wrongful or negligent tortious conduct, plaintiff suffered pain

and suffering and died and seeks the following:

   a. Compensatory damages including pain and suffering and loss of
   enjoyment  of life;

   b. Punitive damages;

   c. Attorney costs and fees;

   d. Pecuniary damages including, any loss of future wages and attending
   interest as a result of the tortious behavior.

   e. All other damages available under the appropriate Model Jury Charge.

   f. Pain and suffering incurred and for any other damages caused on
   account of other tortious conduct, emotional damages, physical damages,
   and loss of enjoyment and life and pain and suffering.

## Count XIII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Plaintiff Myrlene Laurince in her individual capacity v. Defendants Sharpe, Havlicek, Fernandez, City of Englewood and the Englewood Police Department*

301.   Plaintiff hereby incorporates and re-alleges all preceding paragraphs as

though fully pleaded herein.

302.   All named Defendants at all relevant times committed civil rights violations and torts against Plaintiff's decedent, Bernard Placide, through the use of law means for unlawful purposes and/or by the commission of unlawful acts by unlawful means.

303.   In the process of violating Plaintiff's decedent's rights as are stated in this Complaint above and incorporated by reference as if stated in full herein, the Defendants committed the tort of negligent infliction of emotional distress.

304.   Defendant's negligence caused the death of Bernard Placide.

305.   Plaintiff Myrlene Laurince also seeks separate damages for the reasons stated in Count XI.

306.   As a direct result of the willful misconduct, active participation, willful indifference, and negligence on the part of the Defendants named in the cause of action, Bernard died and Myrlene Laurince suffered at the site of his shooting and death and suffered grave long term emotional suffrage and emotional damages.

307.   No Defendant public entity named above has taken any action to redress the use of excessive force and other civil rights violations committed against the Plaintiff,  although all these Defendants have knowledge of the events described in this Complaint, and they had/have the power authority, and legal responsibility to take remedial action. All named defendant public

entities through action and/or inaction have compounded the unlawful and tortious behavior that serves the basis of this cause of action.

308.  Plaintiff seeks liability against Defendants EPD and Englewood entities under an imputed and vicarious liability theory.

309.  Punitive damages are sought in this matter for the reasons stated in the preceding sections of this Complaint and are incorporated by reference as if stated in full herein.

310.  As a direct result of these aforesaid actions of the Defendant/s, their agents, employees, and servants, and as a direct result of their malicious and intentional wrongful or negligent tortious conduct, plaintiff suffered pain and suffering and died and seeks the following:

    a. Compensatory damages including pain and suffering and loss of enjoyment  of life;

    b. Punitive damages;

    c. Attorney costs and fees;

    d. Pecuniary damages including, any loss of future wages and attending interest as a result of the tortious behavior.

    e. All other damages available under the appropriate Model Jury Charge.

    f. Pain and suffering incurred and for any other damages caused on account of other tortious conduct, emotional damages, physical damages, and loss of enjoyment and life and pain and suffering.

## COUNT XIV - ASSAULT AND BATTERY

*Plaintiff v. Defendants City of Englewood and the Englewood Police Department*

311.   Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

312.   All named Defendants at all relevant times committed civil rights violations and torts against Plaintiff through the use of law means for unlawful purposes and/or by the commission of unlawful acts by unlawful means.

313.   In the process of violating Plaintiff's rights as are stated in this Complaint above and incorporated by reference as if stated in full herein, Defendants' conduct resulted in an unprovoked, unpermitted, harmful, and offensive contact with Plaintiff's decedent, and thus Defendants committed the tort of Assault and Battery.

314.   Defendants committed an assault in excessively using force and lethal force in the form of deploying a taser and in shooting and killing Bernard Placide. Defendants intended to cause a harmful or offensive contact with the Plaintiff, or an imminent apprehension of such a contact, and put the Plaintiff in such imminent apprehension. The battery was caused by Defendants making nonconsensual contact with Plaintiff's decedent.

315. Punitive damages are sought in this matter for the reasons stated in the preceding sections of this Complaint and are incorporated by reference as if stated in full herein below.

316. Plaintiffs seek liability against Defendants EPD and Englewood entities under an imputed and vicarious liability theory.

317. As a direct result of these aforesaid actions of the Defendant/s, their agents, employees, and servants, and as a direct result of their malicious and intentional wrongful or negligent tortious conduct, plaintiff suffered pain and suffering and died and seeks the following:

a. Compensatory damages including pain and suffering and loss of enjoyment  of life;

b. Punitive damages;

c. Attorney costs and fees;

d. Pecuniary damages including, any loss of future wages and attending interest as a result of the tortious behavior.

e. All other damages available under the appropriate Model Jury Charge.

f. Pain and suffering incurred and for any other damages caused on account of other tortious conduct, emotional damages, physical damages, and loss of enjoyment and life and pain and suffering.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff demands judgment against Defendants, jointly and severally, as follows:

1) A money judgment against all Defendants for compensatory damages; costs of suit necessarily incurred; Punitive damages in an amount sufficient to deter future misconduct; reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

2) Appropriate declaratory relief regarding the unlawful and unconstitutional polices and customs of the City of Englewood Police Department, and appropriate equitable relief, including the enjoining and permanent restraining of these violations, and direction to the City of Englewood and the Chief of Police of the Englewood Police Department to take affirmative steps necessary to ensure that the effects of the unlawful practices are eliminated;

3) Appointment of a receiver or similar authority to ensure that the City of Englewood and the Englewood Police Department properly trains and supervises its officers and utilizes this case's body cams and reports as a training tool to ensure that Black lives will be saved so that Bernard Placide did not die in vain; and

4) Such other and further relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 26, 2023

Eric V. Kleiner
385 Sylvan Avenue
Suite No. 29, Second Floor
Englewood Cliffs, NJ 07632
Tel: (201) 394-6229
Fax: (845) 353-7828
Email: erickleiner@verizon.net
Eric V. Kleiner
New Jersey Bar No. 003951988
*Attorney for Plaintiff, THE ESTATE OF*
*BERNARD PLACIDE*